**STATE of Missouri, Plaintiff–Respondent,**

v.

**Steve NALLS, Defendant–Appellant.**

**No. 59668.**

Missouri Court of Appeals,
Eastern District,
Division Three.

June 30, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
July 30, 1992.

Application to Transfer Denied
Sept. 22, 1992.

Craig A. Johnston, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Presiding Judge.

A jury convicted defendant, Steve Nalls, of murder in the first degree, § 565.020 RSMo 1986, and armed criminal action, § 571.015 RSMo 1986. The trial court sentenced defendant as a persistent and prior offender to life without parole for the murder conviction and to a consecutive life term for the armed criminal action conviction. On appeal, defendant argues the trial court erred in: (1) overruling defendant's challenges for cause to two venirepersons; and (2) its instructions on self-defense and reasonable doubt. We affirm.

On October 25, 1989, Kevin McCoy, the victim, and Robert Thomas drove to a gas station in the City of St. Louis. When McCoy and Thomas drove into the station, the defendant, Byron Bush and Anthony Johnson were walking nearby. Bush told the defendant he saw McCoy at the station. Defendant then told Bush to give him a pistol Bush was carrying, and Bush complied.

McCoy walked to the station's building to pay for gas and defendant walked over to McCoy's car. Thomas raised the passenger window when he saw defendant approach the car. Defendant asked Thomas why he raised the window and Thomas said he thought the defendant was going "to do something" to him. Defendant replied "no" and then walked to the driver's side of the car, took the keys out of the car and threw the keys. McCoy walked back to the car and he and defendant began to argue about the keys and an accusation McCoy made the day before that the defendant shot at another person. Defendant hit McCoy and McCoy hit the defendant. The defendant then pulled the pistol from his pocket while McCoy ran toward the station's building. Defendant shot twice and one shot shattered one of the building's windows. After McCoy was unable to enter a locked door, he jumped through the shattered window. Defendant ran to the window and fired a third shot while McCoy attempted to crawl under a counter.

On October 27, 1989, defendant gave an audiotaped statement to two St. Louis City detectives. Defendant admitted he told Bush to give him the pistol after Bush told him McCoy was at the station. Defendant also stated that after the argument began

and before he hit McCoy, McCoy went to his car, lifted up the seat and pulled down his shirt. Defendant believed McCoy "had gotten a gun or something from the car." Defendant admitted he never actually observed McCoy with a gun. Defendant also admitted he threw the first punch and that McCoy then hit defendant with a glancing blow. Defendant stated McCoy then "started running, he went to turn around and I thought he should have pulled out a gun, so I pulled out the gun I had." Defendant admitted he fired two shots at McCoy and then followed McCoy to the station's building. Defendant stated further, "I came behind him [McCoy] and stuck my arm inside the window that he had went through and pulled the trigger."

The trial commenced on December 10, 1990. Michael Graham, Chief Medical Examiner for the City of St. Louis, testified that two bullets struck McCoy. Graham also testified that the fatal bullet struck McCoy in the back and went through his right lung and heart and the other bullet struck McCoy in the right leg. The jury heard defendant's taped statement. Thomas testified that after the argument started McCoy never returned to his car. Thomas testified further that the only person he saw with a gun was the defendant. Defendant did not testify at trial. The jury convicted defendant of first degree murder and armed criminal action and this appeal followed.

■ Defendant argues the trial court erred in overruling the challenges for cause to venirepersons Reeves and Sanders. During voir dire Reeves and Sanders raised their hands in response to the trial court's question whether anyone would be unable to follow the reasonable doubt instruction. The following dialogue occurred during the voir dire examination of venireperson Katie Reeves:

> THE COURT: ... Miss Reeves, you raised your hand in response to my question. Can you explain to us why you wouldn't be able to follow that instruction?
> VENIREPERSON REEVES: Well, I had to prosecute a criminal in '84 on at-

tempt[ed] burglary, and I'm just nervous about that. I don't know if I could really be fair about that.

\*   \*   \*   \*   \*   \*

MR. CRADDICK [for the State]: ... Do you think you were treated fairly by the criminal justice system?
VENIREPERSON REEVES: Yes.

\*   \*   \*   \*   \*   \*

MR. CRADDICK: And, if the judge informed you that you're required to follow certain instructions, do you believe that you can follow those instructions?
VENIREPERSON REEVES: Yes, I could follow the instructions.

\*   \*   \*   \*   \*   \*

MR. CRADDICK: ... One of those instructions may require you to decide the guilt or non-guilt of the defendant. Do you believe that you can follow such an instruction?
VENIREPERSON REEVES: I can follow the instruction.
MR. CRADDICK: Okay, and the particular instruction that the court was asking you about concerns the reasonable doubt, did you hear that instruction when it was read?
VENIREPERSON REEVES: Yes, I did.
MR. CRADDICK: ... Will you follow that instruction?
VENIREPERSON REEVES: I will do my best.
MR. CRADDICK: Okay, I understand that response. But what we need to know now is whether or not you will disregard it based on some other personal beliefs that you have?
VENIREPERSON REEVES: I will follow the instruction.

\*   \*   \*   \*   \*   \*

MR. McKAY [for the defendant]: ... I'm just wondering if ... you might be inclined to hold them [the state] to a little less standard of proof because of the fact that you have been a victim of a crime, and you may sympathize with people who are victims of crime?
VENIREPERSON REEVES: No, I don't think so. This is hard for me. I'll follow

the instruction. I'll just follow the instruction. That's hard to say. I don't think I would be swayed. I have to listen to it.

THE COURT: ... Could you put aside the experience you had back in 1984 and listen to the evidence in this case based on the evidence that you hear here and render a fair and impartial decision, that is fair and impartial to both sides and not lean one way or the other?

VENIREPERSON REEVES: All I can say, Judge, I'll do my best. But I have seen so much. I work in the hospital and I see so much that comes in, and I'm just really—It upsets me, to be honest with you.

THE COURT: I'm sure of that. And I think it does all of us. We're all upset at crime. But what we need to know whether or not with respect to this defendant, whether you can give him the presumption of innocence through the trial and listen to the evidence and base your decision if you're on this jury on the evidence and not on the fact that you're upset at crime, because we all are, can you be fair and impartial?

VENIREPERSON REEVES: Yes, I'll be fair.

THE COURT: Thank you, Miss Reeves. Anymore questions?

MR. McKAY: I just detect that you're not certain that you can do that?

VENIREPERSON REEVES: I'll do my best. That's all I can, say I'll do. I have to be honest with you. I'll do my best and listen.

THE COURT: Okay, thank you.

A venireperson must be able to enter upon jury service with an open mind free from bias and prejudice. *State v. Wheat,* 775 S.W.2d 155, 158 (Mo. banc 1989), cert. denied, 493 U.S. 1030, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990). "A trial court has wide discretion in determining the qualifications of members of the venire, and on appeal the court will not disturb the trial court's ruling on a challenge for cause absent a clear abuse of discretion and a real possibility of injury to the complaining party." *State v. Walton,* 796 S.W.2d 374, 377 (Mo.

banc 1990). A trial court determines a potential juror's qualifications after considering the relevant voir dire in its entirety. *State v. Wheat,* 775 S.W.2d at 158. It must clearly appear from the evidence that the challenged venireperson was in fact prejudiced. *State v. Walton,* 796 S.W.2d at 377.

Although Reeves was a victim of attempted burglary in 1984, she stated the criminal justice system treated her fairly. After stating that crime upset her, Reeves told the trial court she would be fair. Reeves also stated five different times she would follow the court's instructions. We defer to the trial court's superior position to determine a venireperson's ability to follow the law and doubts as to the trial court's findings will be resolved in its favor. *Id.* 796 S.W.2d at 378. The trial court did not err in overruling defendant's challenge for cause to venireperson Reeves.

The following dialogue occurred during the voir dire examination of venireperson Lee Sanders:

THE COURT: ... Miss Sanders, you raised your hand in response to my question about your ability to follow the instruction that I read. Can you tell us a little bit more about why you would not be able to do that?

VENIREPERSON SANDERS: Because back in 1986 my uncle Alvin Griffin was murdered and they never found out who murdered him. So I'm not really prejudiced, it wouldn't be prejudice, but I couldn't sit there and not let you all know that that happened. It was February the 13th, 1986.

THE COURT: Are you indicating then the fact that you have a relative that has been murdered would keep you from being fair if you're selected as a juror?

VENIREPERSON SANDERS: No, I couldn't, but I couldn't sit back and let you all know that it happened, no, because I'm a Christian. I would say, you know, I would be fair.

MR. CRADDICK: ... Could you sit and listen to the evidence and decide the case fairly and impartially based on the evi-

dence that you heard, and follow the law of the court?

VENIREPERSON SANDERS: Yes, I could.

MR. CRADDICK: Okay. And what you're bringing to our attention is that your family had a matter that you believe should be brought to our attention then?

VENIREPERSON SANDERS: Right.

MR. CRADDICK: And in spite of that, will you hold it against Steve Nalls?

VENIREPERSON SANDERS: No.

\* \* \* \* \* \*

MR. CRADDICK: And that fact that you have a relative that has been a victim of a violent crime affect your ability to be fair and impartial?

VENIREPERSON SANDERS: No, it wouldn't.

\* \* \* \* \* \*

MR. McKAY: ... But only you can really say whether in your own heart you know that this experience with your uncle won't interfere?

VENIREPERSON SANDERS: In my own heart, it would not interfere.

A prospective juror's relationship to a violent crime victim is not a sufficient reason by itself to sustain a challenge for cause. *State v. Hopkins*, 687 S.W.2d 188, 190 (Mo. banc 1985). "It is when these relationships combine with other factors to indicate a lack of impartiality that a challenge for cause must be sustained." *Id.* No other factors indicate that Sanders would not be impartial. An examination of Sanders' voir dire demonstrates she only wanted to inform the court of her uncle's murder. Sanders stated unequivocally she would be fair and impartial. The trial court did not abuse its discretion in overruling defendant's challenge for cause to venireperson Sanders.

■ Defendant argues the trial court erred in failing to include in the self-defense instruction paragraph B(3)[B] of MAI–CR3d 306.06. In determining whether a self-defense instruction is required, we view the evidence in the light most favorable to the defendant. *State v. Skinner*,

734 S.W.2d 877, 880 (Mo.App.1987). Deadly force may be used in self-defense only when the following elements are present: (1) an absence of aggression or provocation on the part of the defender; (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death; (3) a reasonable cause for the defender's belief in such necessity; and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. *State v. Bray*, 818 S.W.2d 291, 293 (Mo.App.1991) (citation omitted).

Reviewing the evidence in the light most favorable to the defendant the evidence clearly indicates the defendant was the initial aggressor. When defendant learned McCoy was at the station, defendant told Bush to give him his gun. Defendant approached McCoy's car and after speaking to Thomas grabbed the car keys and threw them. Defendant admitted he threw the first punch. Clearly, there was not an "absence of aggression or provocation on the part of the defender." *See State v. Blaine*, 719 S.W.2d 900, 903 (Mo.App.1986).

"One who is an aggressor or who provoked the difficulty in which he killed another cannot invoke the right to self-defense to justify the homicide unless he has withdrawn from the combat in such a matter to have shown his intention in good faith to desist." *State v. Muhammad*, 757 S.W.2d 641, 643 (Mo.App.1988). At no time during the incident did the defendant withdraw. Even after firing two shots, defendant followed McCoy to the building and fired again while McCoy attempted to crawl under a counter. Defendant was not entitled to a self-defense instruction and therefore cannot claim error for failure to include certain language in the instruction.

Defendant also argues the trial court erred in submitting the reasonable doubt instruction because it incorrectly defines reasonable doubt. The Missouri Supreme Court and this court have repeatedly upheld this instruction. *State v. Griffin*, 818

S.W.2d 278, 282 (Mo. banc 1991); *State v. Turner,* 810 S.W.2d 92, 94 (Mo.App.1991).

Affirmed.

STEPHAN and CRIST, JJ., concur.